UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

STATE UNIVERSITIES RETIREMENT
SYSTEM OF ILLINOIS, Individually and on
Behalf of All Others Similarly Situated,

                Plaintiff,

    vs.

BANK OF AMERICA CORPORATION,
BANK OF AMERICA, N.A., BARCLAYS
BANK PLC, BNP PARIBAS S.A.,
CITIGROUP, INC., CITIBANK, N.A.,
CITIGROUP GLOBAL MARKETS INC.,
CREDIT SUISSE AG, DEUTSCHE BANK
AG, GOLDMAN, SACHS & CO., HSBC
BANK PLC, HSBC BANK USA N.A.,
JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, N.A., MORGAN STANLEY
& CO., LLC, ROYAL BANK OF SCOTLAND
PLC, ROYAL BANK OF SCOTLAND N.V.,
UBS AG, UBS SECURITIES LLC,
INTERNATIONAL SWAPS AND
DERIVATIVES ASSOCIATION, INC. and
MARKIT GROUP LTD.,

              Defendants.

——————————————————————— x

: Civil Action No.

: CLASS ACTION

: COMPLAINT FOR VIOLATIONS OF
: FEDERAL ANTITRUST LAWS

DEMAND FOR JURY TRIAL

*"**It would be unacceptable if banks collectively blocked exchanges to protect their revenues from over-the-counter trading of credit derivatives.  Over-the-counter trading is not only more expensive for investors than exchange trading, it is also prone to systemic risks**."*

– Joaquín Almunia,
Vice President in Charge of Competition Policy
European Commission

Plaintiff State Universities Retirement System of Illinois ("Illinois SURS" or "plaintiff"), individually and on behalf of a Class of all others similarly situated (as defined herein), brings this action for damages and relief against Bank of America, BNP Paribas, Barclays, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Royal Bank of Scotland and UBS (collectively, the "Dealer Defendants"), and against International Swaps and Derivatives Association, Inc. ("ISDA") and Markit Group Ltd. ("Markit") (along with the Dealer Defendants, collectively, "defendants"), for violations of federal antitrust laws, the Sherman Anti-Trust Act ("Sherman Act") and the Clayton Antitrust Act ("Clayton Act"), and for unjust enrichment. Specifically, plaintiff asserts claims under §1 of the Sherman Act against the Dealer Defendants for engaging in a conspiracy to unreasonably restrain trade in the market for credit default swaps ("CDS"), and under §2 of the Sherman Act against defendants for engaging in a conspiracy to monopolize the CDS market.  Based on counsel's investigation, research and review of publicly available documents, on plaintiff's personal knowledge, and upon information and belief, plaintiff alleges as follows:

## INTRODUCTION

1.      Defendants conspired to maintain artificially inflated transaction costs for CDS and preserve their control over pricing and transaction information regarding CDS by blocking both the development of alternative CDS trading platforms, including exchange trading, and access to real-

time CDS transaction information, while directing nearly all CDS trading activity to the Dealer Defendants through defendants' collective efforts to stifle competition in the CDS market.

2.     Credit derivatives are designed to measure and manage credit risks. Over the past decade, the international market for these instruments has grown dramatically. The principal instrument for credit derivatives is the CDS. CDS market participants pursue a number of objectives. First, CDS allow lenders efficiently to hedge their exposure to credit losses. Second, a lender might decide to diversify the concentration of its loan portfolio by selling a CDS on a reference entity[1] that it does not own. Finally, CDS allow participants to take positive or negative credit views on specific reference entities.

3.     In the early 1990s, JPMorgan and other financial institutions developed the first CDS as a way for the banks to protect themselves against their exposure to large corporate loans they made to their clients. Today, CDS are widely used for speculative purposes. From a relatively modest market measured in the low hundreds of billions by the late 1990s, the volume of outstanding CDS exploded after the turn of the century and increased dramatically from $900 billion in 2001 to a gross notional amount[2] of $62 trillion globally in 2007. Today the gross notional amount of CDS is estimated to be close to $25 trillion worldwide, and approximately $13 trillion for U.S. dealer banks.

4.     In its simplest form, a CDS is a contractual agreement that transfers the default risk of one or more reference entities from one party to the other. One party, the protection buyer, pays a periodic fee (or premium) to the other party, the protection seller, during the term of the CDS. The

---

[1]     A reference entity is the underlying entity (*e.g.*, a large corporation, government or other entity that issues debt) that bears the credit risk of a credit derivative contract. In other words, the reference entity is essentially the party upon which the two counterparties in a CDS are speculating.

[2]     For CDS, the notional amount refers to the face value or amount of credit bought or sold, equivalent to debt or bond amounts, and is used to derive the premium payment calculations for each payment period and the recovery amounts in the event of a default.

protection buyer is typically an institutional investor such as a pension fund (like Illinois SURS),

mutual fund or investment advisor while the protection seller is typically a large bank and dealer

such as one of the Dealer Defendants.  If the reference entity defaults or declares bankruptcy or

another negative credit event occurs, the protection seller or dealer bank is obligated to compensate

the protection buyer for the loss by means of a specified settlement procedure.  The protection buyer

is entitled to protection on a specified face value, referred to as the notional amount (the amount of

protection purchased), of reference entity debt.  CDS are similar to insurance contracts in that they

provide protection against default of the underlying reference entity.  Unlike insurance, however,

CDS have been, until recently, virtually unregulated by the government, and there is no central

reporting mechanism to determine their value.

        5.      The transaction cost of the CDS is represented in part by the bid-ask spread.  The bid-

ask spread is the difference between the price the Dealer Defendants bought the CDS (the "bid"

price) and the price they sold the CDS (the "ask" price).  The bid-ask spread is set by the dealer and

represents the transaction costs of the CDS, taking into account unearned credit spread, investing and

funding costs, close out costs and costs of administration, as well as the dealer's margin. The size of

the spread will depend on (at least in theory) the liquidity of the CDS, the size of the transaction, the

dealer's risk tolerance, and whether the trade increases or decreases the risk profile of the dealer's

portfolio.

        6.      From January 1, 2008 to the present (the "Class Period"), the Dealer Defendants, the

incumbent major CDS dealers which collectively controlled over 90% of CDS trading in the United

States, together with Markit and ISDA, two entities owned and/or controlled by the Dealer

Defendants, unreasonably restrained competition in the trading of CDS with non-dealer market

participants or other interested CDS participants.  Among other things, defendants (i) manipulated

the bid-ask spread on CDS transactions; (ii) withheld or otherwise prevented the widespread dissemination of public pricing information of CDS; and (iii) required that any and all CDS transactions include a dealer counterpart.

7. Defendants also maintained their control over the CDS market, coordinating their behavior in order to jointly prevent exchanges from entering the CDS market between 2006 and 2009, by (i) restricting access to and participation in the CDS clearinghouse that provides a necessary input to CDS trading known as "clearing"; (ii) withholding access to intellectual property rights in key CDS products and by using other concerted efforts to successfully block the entry of an independent CDS exchange and clearinghouse; (iii) jointly preventing brokers from providing exchange-like services to non-dealers; and (iv) jointly denying non-dealers broad access and price discovery to real-time CDS bid and ask prices.   Any would-be new entrant exchange or clearinghouse, after failing to overcome defendants' blockade of its entry, was forced to agree with defendants to delay its market entry.

8. For example, Deutsche Börse AG ("Deutsche Börse") and then prominent buy-side market participant Citadel LLC ("Citadel") together with exchange and clearinghouse the Chicago Mercantile Exchange ("CME")[3] attempted to launch central clearing and exchange trading of CDS, for which there was already a widespread demand among investors.  To launch these exchange-traded CDS, the exchanges needed licenses for data and index benchmarks. ISDA, the leading over-

---

[3]    Citadel and CME jointly developed CMDX – an exchange and clearinghouse for CDS. CMDX's clearing platform would have upended the status the Dealer Defendants enjoyed as the exclusive market makers in CDS, and would have reduced counterparty credit risk inherent in OTC trading.  Together, CMDX's exchange and clearing platforms would have substantially reduced the transaction costs paid by buy-side market participants, such as Plaintiff, to Dealer Defendants.

the-counter ("OTC")[4] derivatives trade organization, and Markit, the leading provider of financial information in the CDS market, conspired with the Dealer Defendants to prevent Citadel and CME from developing a central clearinghouse and exchange for the trading of CDS and refused to provide these licenses. These coordinated efforts were facilitated by the Dealer Defendants' control of ISDA and Markit through their boards of directors, which are comprised predominantly by the Dealer Defendants' executives, and through the Dealer Defendants' partial ownership of Markit.

9.      Additionally, the Dealer Defendants sought to shut out exchanges by coordinating among themselves their own choice of preferred clearinghouse and delaying licensing negotiations between CME, Markit and ISDA while they hurried to launch their own clearinghouse, ICE Trust US (later renamed ICE Clear Credit). In the end, neither Deutsche Börse nor CME managed to create an exchange as planned, which would have reduced counterparty credit risk (the risk to each party of a CDS contract that the counterparty will not live up to its contractual obligations) in CDS trading, provided transparency of the information flow that defendants controlled and decreased transaction costs associated with CDS trading as reflected in the Dealer Defendants' bid-ask spreads. And, by preventing the introduction of exchange trading in CDS, defendants maintained their control of the OTC market and continued to reap supra-competitive transaction costs from the Class.

10.     By keeping information relating to CDS and their bid-ask spreads nebulous and off the exchanges, defendants were able to conceal the difference between what they were willing to buy CDS protection on the spot for and what they were willing to sell it for. The effect of defendants' coordinated and manipulative activities has been to decrease competition in the CDS market among defendants and as a result, defendants' customers were forced to pay inflated bid-ask spreads, which

---

[4]      OTC trading is conducted bilaterally in a private contract between two parties or anonymously through a trading platform, as opposed to trading that takes place on an exchange, where real-time bids and offers are publicly available.

cushion the profits of the defendants while harming their CDS customers (the members of the Class). By one account, exchange trading of CDS could lead to a decline in the bid-ask spread of approximately 75%, similar to what occurred when dividend swaps started trading on the Eurex exchange in July 2008. In such a competitively restricted and concentrated market, defendants' CDS customers must pay more when they buy CDS and are paid less when they sell CDS. Because of the very large amount of U.S. trading of CDS, involving trillions of dollars of notional during the damages period, the resulting harm to the Class members is estimated to be in the tens of billions of dollars.

11.     Defendants' restriction of competition in the trading of CDS has attracted increasing scrutiny by governmental agencies in the United States and the European Union. In July 2009, the Antitrust Division of the U.S. Department of Justice ("DOJ") opened an investigation regarding "anticompetitive practices in the credit derivatives clearing, trading and information services industries." The DOJ investigation originally focused on CDS market players' relationship with Markit and whether those banks that collectively own and control Markit received special access to the firm's information or data, giving them an unfair advantage in the CDS market. In May 2012, the DOJ expanded its investigation to include other companies in the CDS market, amid issues of how licenses for clearing services in the CDS market were granted and questions over whether the largest Wall Street banks' ownership of certain CDS market participants created conflicts of interest. The DOJ investigation of the defendants is ongoing.

12.     In April 2011, the European Union's antitrust authority disclosed that it, too, was investigating whether the Dealer Defendants, along with Markit, colluded and abused their dominant market position to control the financial information on CDS. On March 26, 2013, the Commission expanded its investigation to include defendant ISDA: "The Commission's inquiry found

preliminary indications that ISDA may have been involved in a coordinated effort of investment banks to delay or prevent exchanges from entering the credit derivatives business." And recently, on July 1, 2013, the European Commission announced that it had issued a Statement of Objections to the Dealer Defendants, ISDA and Markit. A "Statement of Objections" is a formal step in its investigations into suspected violations of EU antitrust rules. The Commission informs the parties concerned in writing of the objections raised against them and the companies can examine the documents in the Commission's investigation file, reply in writing, and request an oral hearing to present their comments on the case in front of representatives of the Commission and national competition authorities. The Statement of Objections charged defendants with anti-competitive behavior to block electronic exchanges from entering the credit derivatives business. The Statement of Objections stated that the European Commission had reached a "preliminary conclusion that they infringed EU antitrust rules that prohibit anti-competitive agreements by colluding to prevent exchanges from entering the credit derivatives business."

13.    In discussing the issuance of the Statement of Objections, Commission Vice President in charge of competition policy Joaquín Almunia stated:

> *It would be unacceptable if banks collectively blocked exchanges to protect their revenues from over-the-counter trading of credit derivatives. Over-the-counter trading is not only more expensive for investors than exchange trading, it is also prone to systemic risks.*
>
> *            \*       \*       \**
>
> *[T]he banks acted collectively to prevent this from happening. They delayed the emergence of exchange trading of these financial products because they feared that it would reduce their revenues.*

14.    As a result of defendants' conspiratorial and anti-competitive conduct in the CDS market, defendants reaped substantial and riskless profits from artificially inflated prices at the expense of Illinois SURS and Class members who transacted in CDS during the Class Period.

## JURISDICTION, VENUE AND COMMERCE

15.     This action arises under §§1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

16.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

17.     Venue is proper in this District pursuant to §§4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d).  One or more of the defendants resided, transacted business, was found, or had agents in this District; a substantial portion of the events giving rise to plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

18.     The trade and interstate commerce relevant to this action is the market for CDS in the United States.  Each defendant, directly or through their affiliates or subsidiaries, participated in the market in a continuous and uninterrupted flow of interstate commerce.  The activities of defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a substantial effect on, interstate commerce.

19.     Defendants' conduct had a direct, substantial and reasonably foreseeable effect on domestic commerce.

20.     During the Class Period, each defendant, or one or more of their affiliates, used the instrumentalities of interstate commerce, including interstate, wires, wireless spectrum and the U.S. mail, to join or effectuate their conspiracy.

21.     The Court has personal jurisdiction over each defendant, because each defendant – throughout the United States and including in this District – transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of their illegal scheme and

- 8 -

conspiracy.  The conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

22.    Plaintiff Illinois SURS is located in Champaign, Illinois and is the administrator of benefits for employees of the universities, colleges, and affiliated agencies throughout the State of Illinois.  During the relevant period, Illinois SURS was a buy-side participant in the market for CDS. Plaintiff entered into CDS transactions with numerous defendants during the relevant period.

23.    Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant Bank of America, N.A. is a wholly owned subsidiary of defendant Bank of America Corporation.  On January 1, 2009, Bank of America merged with Merrill Lynch & Co., Inc., assuming its assets and liabilities.  Before the acquisition, Merrill Lynch Bank USA, a wholly owned subsidiary of Merrill Lynch & Co., Inc., was a CDS dealer and acted as a counterparty in CDS transactions.  Defendants Bank of America Corporation, Bank of America, N.A., and Merrill Lynch Bank USA are collectively referred to as "Bank of America."  Bank of America maintains offices and transacts business in Chicago, Illinois.  Bank of America is a CDS dealer and acts as a counterparty in CDS transactions.  Representatives of Bank of America sit on the boards of ISDA and Markit and on ICE Clear Credit's Risk Committee. Bank of America is a shareholder of Markit.

24.    Defendant Barclays Bank PLC ("Barclays") is a United Kingdom public company that maintains offices and transacts business in Chicago, Illinois.  Barclays is a CDS dealer and acts as a counterparty in CDS transactions.  Representatives of Barclays sit on the board of ISDA and on ICE Clear Credit's Risk Committee.  Barclays is a shareholder of Markit.

25.    Defendant BNP Paribas S.A. ("BNP Paribas") is a French banking company that maintains offices and transacts business in Chicago, Illinois.  BNP Paribas is a CDS dealer and acts

as a counterparty in CDS transactions.  Representatives of BNP Paribas sit on the board of ISDA.
BNP Paribas is a shareholder of Markit.

26.     Defendant Citigroup, Inc. is a United States financial services corporation
headquartered in New York, New York.  Defendant Citibank, N.A. is a wholly owned subsidiary of
defendant Citigroup, Inc.  Defendant Citigroup Global Markets Inc. is the U.S.-based brokerage and
securities arm of defendant Citigroup, Inc.  Defendants Citigroup, Inc., Citibank, N.A., and
Citigroup Global Markets Inc. are collectively referred to as "Citi." Citi maintains offices and
transacts business in Chicago, Illinois. Citi is a CDS dealer and acts as a counterparty in CDS
transactions. Representatives of Citi sit on the board of ISDA and on ICE Clear Credit's Risk
Committee.  Citi is a shareholder of Markit.

27.     Defendant Credit Suisse AG ("Credit Suisse") is a corporation organized under the
laws of Switzerland that maintains offices and transacts business in Chicago, Illinois.  Credit Suisse
is a CDS dealer and acts as a counterparty in CDS transactions.  Representatives of Credit Suisse sit
on the board of ISDA and on ICE Clear Credit's Risk Committee.  Credit Suisse is a shareholder of
Markit.

28.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German public company that
maintains offices and transacts business in Chicago, Illinois.  Deutsche Bank is a CDS dealer and
acts as a counterparty in CDS transactions.  Representatives of Deutsche Bank sit on the board of
ISDA and on ICE Clear Credit's Risk Committee.  Deutsche Bank is a shareholder of Markit.

29.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a wholly owned subsidiary
of the U.S. financial services corporation Goldman Sachs Group, Inc., an American public company
that maintains offices and transacts business in Chicago, Illinois.  Goldman Sachs is a CDS dealer
and acts as a counterparty in CDS transactions.  Representatives of Goldman Sachs sit on the boards

of ISDA and Markit and on ICE Clear Credit's Risk Committee.  Goldman Sachs is a shareholder of Markit.

30.     Defendant HSBC Bank plc is a wholly owned subsidiary of HSBC Holdings plc, a United Kingdom public company.  Defendant HSBC Bank USA N.A. is incorporated in Virginia and is a subsidiary of HSBC Holdings plc.  Defendants HSBC Bank plc and HSBC Bank USA N.A. are collectively referred to as "HSBC."  HSBC maintains offices and transacts business in Chicago, Illinois.  HSBC is a CDS dealer and acts as a counterparty in CDS transactions.  Representatives of HSBC sit on the boards of ISDA and Markit.  HSBC is a shareholder of Markit.

31.     Defendant JPMorgan Chase & Co. is a Delaware financial holding company headquartered in New York, New York.  Defendant JPMorgan Chase Bank, N.A. is a principal bank subsidiary of defendant JPMorgan Chase & Co.  On May 29, 2008, JPMorgan Chase & Co. merged with Bear Stearns & Co., assuming its assets and liabilities.  Before the acquisition, Bear Stearns & Co. was a CDS dealer and acted as a counterparty in CDS transactions.  Collectively, defendant JPMorgan Chase & Co., defendant JPMorgan Chase Bank, N.A. and Bear Stearns & Co. are referred to as "JPMorgan."  JPMorgan maintains offices and transacts business in Chicago, Illinois. JPMorgan is a CDS dealer and acts as a counterparty in CDS transactions.  Representatives of JPMorgan sit on the boards of ISDA and Markit and on ICE Clear Credit's Risk Committee. JPMorgan is a shareholder of Markit.

32.     Defendant Morgan Stanley & Co., LLC ("Morgan Stanley") is a subsidiary of Morgan Stanley, a global financial services company that maintains offices and transacts business in Chicago, Illinois.  Morgan Stanley is a CDS dealer and acts as a counterparty in CDS transactions. Representatives of Morgan Stanley sit on the boards of ISDA and Markit and on ICE Clear Credit's Risk Committee.  Morgan Stanley is a shareholder of Markit.

33.     Defendant Royal Bank of Scotland PLC is the primary operating bank of the Royal Bank of Scotland Group PLC, a United Kingdom company.  Defendant Royal Bank of Scotland N.V. operates as a subsidiary of RBS Holdings N.V.  Defendants Royal Bank of Scotland PLC and Royal Bank of Scotland N.V. are collectively referred to as "Royal Bank of Scotland."  Royal Bank of Scotland maintains offices and transacts business in Chicago, Illinois.  Royal Bank of Scotland is a CDS dealer and acts as a counterparty in CDS transactions.   Royal Bank of Scotland is a shareholder of Markit.

34.     Defendant UBS AG is a Swiss global financial services company.  Defendant UBS Securities LLC is a subsidiary of UBS AG and is a U.S.-registered broker dealer and futures commission merchant.  Collectively, UBS AG and UBS Securities LLC are referred to as "UBS."  UBS maintains offices and transacts business in Chicago, Illinois.  UBS is a CDS dealer and acts as a counterparty in CDS transactions.  Representatives of UBS sit on ICE Clear Credit's Risk Committee.  UBS is a shareholder of Markit.

35.     Defendant International Swaps and Derivatives Association, Inc. ("ISDA") is a financial trade association representing participants in the OTC derivatives market.  Its members include Dealer Defendants, which control ISDA through seats on its board of directors.  In June, 2013, it was reported that Stephen O'Connor, a 25-year veteran in derivatives at defendant Morgan Stanley, left to become ISDA's full-time chairman of the board.  O'Connor had been on ISDA's board since 2008, and has been chairman since April 2011.  ISDA's board members also include representatives from defendants Bank of America, Barclays, BNP Paribas, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan and Morgan Stanley.

36.     Defendant Markit Group Ltd. ("Markit") is a private financial information company founded in 2001 as the first independent source of credit derivative pricing.

(a)     In return for entering into a data service agreement ("DSA") to provide Markit with exclusive access to their CDS transactional data, the Dealer Defendants were allotted shares of Markit and positions on Markit's board of directors.  As such, Markit is owned, in part, by 16 shareholder banks, including Bank of America, Barclays, BNP Paribas, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Royal Bank of Scotland and UBS. Markit has "unparalleled access to a valuable dataset" of OTC derivatives through its "unique relationships with [its] bank shareholders."  Dealer Defendants control Markit through seats on its board of directors.  Markit's board of directors includes employees of Bank of America, Goldman Sachs, HSBC, JPMorgan and Morgan Stanley.   Individuals serving on Markit's board are immediately removed when they are no longer employed by a bank with a valid DSA, and any Markit shares they may own individually are immediately forfeited.

(b)     CDX indexes, published by Markit, are the most actively traded indexes based upon North American reference entities.  iTraxx indexes, also published by Markit, are the most actively traded indexes based upon European or Asian reference entities.  One of the counterparties to a CDX or iTraxx CDS index transaction must hold a Markit index license.  Only major dealers, including defendants, hold Markit index licenses.

## CO-CONSPIRATORS

37.     Co-conspirator ICE Clear Credit is a subsidiary of Intercontinental Exchange, Inc., and is the world's largest clearinghouse for CDS.  ICE Clear Credit launched on May 9, 2009.  Prior to July 16, 2011, ICE Clear Credit operated as ICE Trust U.S.  These entities are sometimes collectively referred to as "ICE."  ICE was founded in 2000 with the financial support of, in part, Goldman Sachs and Morgan Stanley.  Dealer Defendants control ICE Clear Credit's membership and rules through seats on ICE Clear Credit's Risk Committee, which writes or approves ICE Clear Credit's clearing rules.  The membership of ICE Clear Credit's Risk Committee is not publicly

- 13 -

disclosed, but at the relevant time was reported to include senior personnel of defendants, including Ali Balali of Bank of America, Paul Mitrokostas of Barclays, Biswarup Chatterjee of Citi, Andy Hubbard of Credit Suisse, Athanassios Diplas of Deutsche Bank, Oliver Frankel of Goldman Sachs, Thomas J. Benison of JPMorgan, James J. Hill of Morgan Stanley and Paul Hamill of UBS.

38.     Various other persons and entities, presently unknown to plaintiff, participated as co-conspirators with defendants in the violations alleged herein, and aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

## BACKGROUND AND FACTUAL ALLEGATIONS

### Credit Default Swaps and the Development of the CDS Market

39.     A derivative is a bilateral agreement that shifts risk from one party to another.  Its value is derived from the value of an underlying price, rate, index or financial instrument.  A credit derivative is an agreement designed explicitly to shift credit risk between the parties.  Its value is derived from the credit performance of one or more corporations, sovereign entities or debt obligations.[5]  Derivatives may be used either to take a position on the underlying asset, or as a tool to transfer or hedge risk.  Depending on the asset class and type of instrument, derivatives can be traded through an exchange, where a central order book matching system executes trades, or they can be traded in the OTC market, where the terms of the contract can either be privately negotiated between two parties or anonymously traded through a multilateral organized trading platform.

40.     Credit derivatives emerged from default insurance in the mid-1990s as bilateral OTC instruments that allowed one party (the protection buyer) to diversify or hedge credit-related risks associated with ownership of a reference obligation to another party (the protection seller) for a

---

[5]     David Mengle, *Credit Derivatives: An Overview*, Federal Reserve Bank of Atlanta, Economic Review, Fourth Quarter 2007, *available at* http://www.frbatlanta.org/filelegacydocs/ erq407_mengle.pdf.

price. The reference obligation associated with an OTC credit derivative may be a corporate debt obligation, such as a bond or bank loan, a sovereign debt obligation, an asset-backed security, such as commercial mortgage-backed securities, or any other obligation of debt.

41.     The vast majority of credit derivatives take the form of a CDS, which is a contractual agreement designed to assume or shift the credit or default risk of one or more reference entities from one party to another.  These credit risks may include, for example, loan defaults or bankruptcy, within a specified interval of time.  The protection buyer pays a periodic fee ("XX basis points per annum") to the protection seller during the term of the CDS.  If the reference entity defaults or another credit event occurs, *e.g.*, declaring bankruptcy, the protection seller is obligated to compensate the protection buyer ("default payment") for the economic loss associated with a material decline in the value of a reference obligation.  Reference entities, which are not parties to the CDS, may include corporations, sovereigns, municipalities or structured-finance vehicles. Reference obligations are debt obligations of the reference entity that are deliverable upon the occurrence of a credit event.  In addition to the entity they reference, CDS are defined by the amount of protection purchased (the notional amount) and the term of the contract.  The following diagram demonstrates the mechanics of a CDS.

Mechanics of a Credit Default Swap



42.     In a CDS, the protection buyer pays the protection seller a periodic fixed payment or premium for the credit protection offered by the CDS, similar to an insurance policy.  The premium is expressed as a percentage of a CDS' notional amount and is denominated in basis points.  CDS premium pricing is based on the probability that the reference entity will experience a credit event and the expected recovery rate.  The expected recovery rate is the fractional amount of par value that the protection seller can expect to recover upon taking possession of the devalued asset or liquidating the contract, and is often defined as a percentage of the face value of the reference obligation.

43.     When a negative credit event occurs, the protection seller pays the protection buyer a protection payment that is some fraction of the par value of the reference asset, to compensate the protection buyer for the asset's devaluation.  Credit events are specified in CDS, including the default of the reference entity on which credit protection is bought and sold.  A credit event can be the bankruptcy of a reference entity, a reference entity's failure to pay on a debt obligation, the repudiation of a debt obligation, a moratorium placed on a debt obligation, the acceleration of the payment terms of a debt obligation, a default on a debt obligation and/or a restructuring of the terms

of a debt obligation. Generally, bankruptcy, along with failure to pay and restructuring, are considered to be among the three most important trigger events for settling a CDS.

44.      CDS transactions take place through dealers rather than on exchanges. The fixed payment for protection to the dealer, typically paid quarterly, is known as the CDS spread or premium, which is expressed in basis points, where one basis point is 0.01% of the notional value (or size) of the CDS transaction. For example, in a typical $10,000,000 CDS with a five-year maturity at 40 basis points (0.40%), the dealer would receive $10,000 in regular fixed quarterly payments for five years from the buyer for providing the credit default protection. The basis points paid by the protection buyer are dependent upon the stability and riskiness of the underlying credit of the reference entity. The riskier the credit, the higher the basis points and premiums paid to the dealer. In this example, the buyer would have lost $200,000 (($10,000 x 4 quarters/year) x 5 years) if no credit event occurred. In the event of a credit event, the buyer no longer needs to pay the dealer the installments, and the dealer will pay back the buyer either the par value of the notional (*i.e.*, the amount of protection purchased) or the notional minus the price assigned to the reference obligation (*i.e.*, the debt obligation of the reference entity) depending on the settlement procedure (physical or cash, respectively).

45.      CDS may have one reference entity, in which case they are single-name CDS, or a basket of reference entities, in which case they are index CDS. Index CDS account for approximately 50% or so of all CDS trades. Index CDS are referenced to a portfolio of single-name CDS, usually of 100 to 125 credits. In most indexes, the single-name CDS carry equal weights in the portfolio. Once the portfolio is formed, it remains static through the life of the instrument. Only a credit event at one of the referenced entities results in the removal of the name from the instrument, as well as a corresponding reduction in notional amount. Defendant Markit owns two CDS index

families, CDX and iTraxx, which are effectively the sole indices traded and which each include several sub-indices for various industries or regions and for different maturities.

46.     CDS are highly standardized with respect to contractual terms as well as notional sizes and maturities, and thus are particularly well-suited for exchange-based trading. ISDA, the primary derivatives trade group, which is controlled by Dealer Defendants through board membership, promulgates various initiatives to standardize virtually all terms of CDS contracts. For example, one study concluded that as of 2011, 97% of CDS contracts had fixed quarterly payment dates, while 92% had a fixed coupon or total annual payment. Similarly, 43% of single-name CDS were 5-year contracts and 36% were traded in sizes of either 5 or 10 million.

47.     The relevant market at issue in this action is the market for the purchase and sale of CDS in the United States, including the purchases and sales of domestic and foreign CDS. Dealer Defendants together exercise market power in the CDS market, and are the largest CDS dealers in both the United States and the world. During the relevant period, defendants Bank of America, Barclays, BNP Paribas, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Royal Bank of Scotland and UBS accounted for well in excess of 90% of U.S. CDS dealing by notional amount. According to the United States Office of the Comptroller of the Currency's most recent quarterly derivatives report, the top five U.S. commercial bank CDS dealers in terms of notional amount bought and sold are defendants JPMorgan, Citibank, Bank of America, HSBC and Goldman Sachs, in that order.[6] According to a report by Deloitte LLP, the major banks earn approximately $55 billion per year in revenues from OTC derivatives (roughly 37% of overall bank revenues). A substantial portion of these revenues come from CDS each year.

---

[6]     These banks account for over 99% of the annual CDS notional volume of all U.S. commercial bank dealers.

48.     According to the Herfindahl-Hirschman Index ("HHI"), a commonly accepted measure of market concentration, the Dealer Defendants possess an extraordinary amount of market concentration.  The HHI takes into account the relative size and distribution of firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size.  Markets in which the HHI is in excess of 1,800 points are considered to be concentrated, and transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the Horizontal Merger Guidelines issued by the DOJ and the Federal Trade Commission.  The HHI for the U.S. commercial bank market in credit derivatives at its peak in 2001 was 5,000, which is an astonishing degree of concentration.  In 2011, the HHI was 3,014 – still significantly higher than the level at which the DOJ considers a market to be concentrated.

49.     There is no substitute for the protection afforded by CDS.  The rapid rise in CDS volume following their inception in the mid-1990s demonstrates that investors turned to CDS to secure the unique and critical function of credit protection.  The outstanding notional value of CDS increased from $100 billion in 1998 to $1 trillion in 2000, to $62 trillion in 2007, before dipping to approximately $30 trillion following the recession of 2008.

50.     ISDA and Markit are integral to the functioning of the CDS market.  ISDA and Markit provide the licensing, standards, codes and transaction information necessary for CDS transactions to occur.  They are controlled by Dealer Defendants.  Moreover, ISDA and Markit have contracted, combined and conspired with Dealer Defendants to prevent the establishment of exchange-trading platforms, as alleged herein.

51.     High barriers to, and the extreme difficulty of, entry into the CDS market, as well as concerted conduct by defendants to maintain their sell-side monopoly, protect the Dealer

Defendants' market power.  The Dealer Defendants' control of Markit and ISDA prevent any competitor from entering the market.

**Defendants' Control of OTC Trading and CDS Information**

52.    Throughout the Class Period, CDS traded OTC – that is, off exchanges.  In OTC trading, CDS are negotiated privately and bilaterally, although in practice CDS contracts are highly standardized.  In the OTC market, buy-side participants such as institutional investors and other non-dealer financial institutions lack access to key price information such as bids, asks and actual transaction prices. Price transparency and price discovery are general indications of efficient competitive markets.  Despite the fact that CDS turn over at a rate of $2 trillion in notional per week, buy-side participants lack real-time bid, ask and transaction price information. This lack of transparency, caused by defendants, benefitted the Dealer Defendants to Class members' (the buy-side participants) detriment by allowing the Dealer Defendants to profit from supra-competitive bid-ask spreads.

53.    The Dealer Defendants exploit the lack of price transparency through their control over Markit and other data entities to block buy-side market participants' access to actual, real-time trade data.  In fact as of mid-2009, JPMorgan was Markit's largest shareholder, followed by Bank of America (together with the shares of then-recently purchased Merrill Lynch), Royal Bank of Scotland (together with the shares of then-recently purchased ABN Amro Holdings NV) and Goldman Sachs.  The only data made available to the buy side was aggregated or internal dealer mark data filtered through entities controlled by the Dealer Defendants.  Accordingly, buy-side participants cannot see in real-time what other market participants are paying for the same or substantially similar CDS.  The control of pricing information allows the Dealer Defendants to maintain supra-competitive bid-ask spreads on CDS.

54.     With its admittedly "privileged relationships" with its shareholder banks, Markit pulls pricing data from the Dealer Defendants and other market participants, giving it "unparalleled access" to a data set spanning credit, equities and the broader OTC derivative universe.  At Dealer Defendants' direction, Markit does not provide the actual CDS trade data it collects to buy-side market participants, which serves the economic interests of the Dealer Defendants.  There is no legitimate reason why Markit would not make this data available, for instance, to buy-side participants on a paid subscription basis or in accordance with how such information is provided in other trading markets.

55.     As part of defendants' efforts to control the market for information regarding CDS trades, including real-time CDS pricing and transaction data, the Dealer Defendants jointly agreed to supply Markit with exclusive information regarding their CDS trades.  Markit in turn agreed with the Dealer Defendants to limit the dissemination of that CDS trading information, report only daily average – not real time – prices for CDS transactions, and provide the Dealer Defendants unfair access to Markit's pricing information.  This enabled Markit to become the exclusive source of published CDS trading data.  As a result, Markit was able to control the dissemination CDS data, including critical information that would, in a transparent, competitive market, allow non-dealer CDS market participants to obtain accurate information regarding the CDS trades.

56.     Markit's agreement to withhold CDS information is contrary to its own interests. If Markit were acting in its independent interest instead of at the behest of the Dealer Defendants, it would seek to sell real-time price information because such information is both conspicuously lacking from the CDS market and would be extremely valuable to many market participants, including plaintiff and the Class.  Instead, with the assistance and participation of the Dealer

Defendants, Markit was able to maintain its dominance over the market for CDS trading information.

57.    In addition to giving the Dealer Defendants an informational advantage over non-dealers, Markit effectively prevented inter-dealer brokers from brokering trades between non-dealers. An inter-dealer broker in this context is a brokerage firm operating in the CDS market that acts as an intermediary between major dealers to facilitate inter-dealer trades. There is no legitimate reason why any Dealer Defendant would avoid generating additional CDS transactions by precluding an inter-dealer broker from facilitating such trades. The Dealer Defendants failed to pursue this legitimate economic interest and refused to partner with inter-dealer brokers to facilitate additional trades between non-dealers. To the contrary, the Dealer Defendants jointly ensured that all transactions include at least one dealer, thereby ensuring the Markit's continued control over pricing and other critical information.

58.    Markit also operates a service where it collects end-of-day dealer marks, or valuations, on the books of the dealer. These dealer marks are the prices ascribed by traders, at their discretion, to positions on the books of the dealer. Markit then aggregates and "cleanses" this data for retail to customers, either the day after collection or during the day of collection, depending on the subscription. This data does not provide a real-time picture of the market since it is not based on actual transactions and is always delivered at a lag to actual market transactions. During the relevant period, most buy-side participants had little, if any, other price information besides the aggregated, processed and delayed information that Markit released. Therefore, the Dealer Defendants and the institutions they controlled were the only ones with access to actual prices paid or bid by other participants in the market, an invaluable advantage which harmed Illinois SURS and the Class.

59.     The Dealer Defendants also used their control over Depository Trust & Clearing Corporation ("DTCC") to prevent it from publishing actual CDS transaction data.  DTCC, through its subsidiaries, Deriv/SERV LLC and the Warehouse Trust Company LLC, provides post-trade processing services for CDS transactions, such as posting, matching and confirmation.  DTCC collects actual CDS transaction data such as such as clearing, settlement, and information services for equities, corporate and municipal bonds, government and mortgage-backed securities, money market instruments and OTC derivatives.   By November 4, 2008, DTCC began publishing aggregated data from its trade registry, including outstanding gross and net notional values on CDS contracts registered in its warehouse for the top 1,000 underlying single-name reference entities and all indices.  This aggregate data did not include the underlying CDS transaction data and was only published on a weekly basis.  On July 21, 2009, DTCC acknowledged that it had received a DOJ request concerning its conduct in the CDS market.

60.     Similarly, Markit, with the assistance and participation of the Dealer Defendants, successfully thwarted threats to its control over information regarding CDS trades.  For example, in 2009, DTCC joined with defendant Markit to create a joint venture called MarkitSERV that combined the firms' electronic trade processing services for OTC derivatives.  In theory, this would have allowed them to collect and disseminate detailed derivatives transactions prices. However, the Dealer Defendants have kept DTCC and MarkitSERV from providing access to complete and timely derivatives pricing information: DTCC only provides aggregated information on a weekly basis. Markit took over this joint venture directly in April 2013.

61.     The International Organization of Securities Commissions ("IOSCO"), the leading global body of securities regulators, commented in a June 2012 report on the vague nature of the CDS market and trade information related thereto:

Though the amount of public information on CDS has increased over the recent years, the CDS market still retains a high degree of opacity because post-trade transparency is scarce and pre-trade transparency is limited to part of the inter-dealer market . . . .

*        *        *

Regulators would benefit from better access to information on trade and position data, which is necessary for financial stability supervision, for improving the assessment of counterparty risk by CCP [central counterparties] and for the detection of market abuse.

62.     Similarly, a 2011 report by Deloitte LLP concluded that increased transparency and trade reporting requirements could generate reduced bid-ask spreads, as occurred when U.S. corporate bonds compressed by 8%-30% upon the introduction of the Trade Reporting and Compliance Engine ("TRACE").   TRACE is the vehicle developed by the Financial Industry Regulatory Authority ("FINRA") that facilitates the mandatory reporting of over-the-counter secondary market transactions in eligible fixed income securities.   As a result of defendants' conduct, buy-side market participants lack sufficient information to evaluate the CDS prices offered and charged by the Dealer Defendants.

**Exchange Trading, Transparency
and the Reduction of CDS Transaction Costs**

63.     Unlike the CDS market, the markets for equities, bond and futures contain mechanisms that allow the public to see the price of the last transaction traded on the exchanges in real time, as well as current, binding bids and offers.   Traditionally, in capital markets that move from controlled trading environments to exchange trading, or other transparent trading environments, the price for executing and clearing transactions significantly declines.   In the CDS market, the dissemination and availability of pricing information would drive competition and compress bid-ask spreads.

- 24 -

64.     Economic data from three markets – equity options, NASDAQ and TRACE for the corporate bond market – highlights the substantial price reductions that would have resulted had defendants not conspired to exclude exchanges from the CDS market.  These examples provide useful benchmarks for understanding the competitive impacts suffered by plaintiff and other buy-side market participants.  They also indicate that the volume of CDS trading would have increased but for defendants' conspiracy to exclude competition.

65.     Like the current CDS system, the price quotes for equity options traded on an OTC system.  Starting in 1973, however, the Chicago Board Options Exchange ("CBOE") opened an exchange and clearinghouse for equity options, which resulted in straight-through processing.  By 1977, exchange trading of options was universal.  The transaction costs on these derivative products experienced a significant contraction as a result.  In addition, reduced transaction costs resulted in a significant increase in the volume of equity options traded.  For example, on CBOE's opening day in 1973, 911 options contracts traded.  By the end of the month, the CBOE's average daily volume exceeded that of the OTC option market.  On the heels of such exponential growth, the Philadelphia Stock Exchange and American Stock Exchange opened their own option trading floors, increasing competition and bringing options to a wider marketplace.

66.     NASDAQ market makers enforced a minimum spread of $0.25 on an OTC system by not posting odd-eighth quotes for a majority of large NASDAQ stocks.  Litigation resulted in the quoting of NASDAQ shares at odd-eighths ($0.125 increments) and provided an opportunity for increased entrants to the market.  In addition to the changes resulting from litigation, an examination of the U.S. Securities and Exchange Commission's new trading rules for NASDAQ led to a decline in quoted and effective spreads of approximately 30% for the first 100 stocks phased-in under the new rules.  As more entities were allowed to enter into the pricing of NASDAQ shares, the

transaction costs declined to mere pennies on the dollar. Correspondingly, reduced transaction costs provided a significant increase in the volume of shares traded on NASDAQ shares.

67.    In 2002, the National Association of Securities Dealers (now FINRA) launched TRACE, a vehicle that facilitates the mandatory reporting and public dissemination of the OTC market transactions in fixed income securities within 15 minutes of a particular transaction. TRACE reports transactions prices after a brief delay, providing investors some insight into the range of prices at which they are likely to be able to execute their next trades. This can improve the ability of investors, particularly non-dealer investors, to shop around, *i.e.*, to determine more easily whether to accept the bids and offers quoted to them, and also allows them to better monitor the quality of price execution that they have received on their past trades.

68.    A number of independent academic studies have been undertaken to explore the effects of TRACE on the marketplace. According to the studies, TRACE has effectively narrowed bid-ask spreads, widely agreed to be a hallmark of efficient markets and has reduced investor cost significantly. Independent studies indicate estimated annual trading cost reductions of nearly $1 billion for the full corporate bond market. Moreover, there has been no observed loss of liquidity since the launch of TRACE. One study found "a reduction of approximately 50% in trade execution costs for bonds eligible for TRACE transaction reporting."

69.    The equity options, NASDAQ and TRACE examples illustrate that but for defendants' collusion, plaintiff and other buy-side participants would have experienced significantly reduced transaction costs for execution and clearing on single-name and index CDS transactions. The OTC market maintained by defendants substantially inflated CDS premiums over the cost of trading on an exchange such as CMDX, the exchange proposed by Citadel and CME. These inflated premiums result in an overcharge to buy-side CDS market participants of billions of dollars per year

– providing strong incentives for defendants to collude rather than compete. A 2011 report suggests that exchange trading of CDS could lead to a decline in the bid-ask spread of approximately 75%, as occurred when dividend swaps started trading on the Eurex exchange in July 2008.

## DEFENDANTS' UNLAWFUL CONDUCT

### The Financial Crisis Sparks Scrutiny of the CDS Market

70.     After the collapse of Bear Stearns, the bankruptcy of Lehman Brothers, and the federal bailout of AIG in 2008, the CDS market attracted considerable attention from Congress and regulators. Unregulated OTC devices such as CDS, with their lack of price transparency, were blamed for the financial crisis. These events led to calls for transparency and regulation of the CDS market.

71.     There was no centralized exchange or clearinghouse for the CDS market in 2008, and all trades were done bilaterally and OTC, meaning that they were privately negotiated between institutional parties. Buy-side market participants (whether buying or selling CDS contracts) would only enter into CDS transactions with a counterparty that (ostensibly) had sufficient financial resources to provide credit protection, *i.e.*, from a seller that could be depended on to make the payment triggered by a credit event. With OTC trading, the only way for buy-side participants to assure themselves that sellers have sufficient financial resources is to engage in transactions with major financial institutions with significant resources, such as the Dealer Defendants.

72.     Clearing services eliminate such counterparty credit exposure by interposing a central counterparty ("CCP"), or clearinghouse, into every trade as the buyer to every seller and the seller to every buyer. A CCP serves as a contractual partner to both parties entering into a CDS trade. Whether trading OTC or on an exchange, the parties' trade is processed via the CCP. The CCP steps between the two trading parties, replacing the established trade with two matching contracts, and takes on the burden of the counterparty risk management. A clearinghouse, holding precisely

offsetting obligations, makes each payment required to each party and supports its ability to meet those payments by requiring collateral from both parties to the trade and by maintaining default management procedures and a default fund to enable it to perform in the event a CDS buyer or seller defaults. The following diagram illustrates the difference between trading with, and without a CCP. The "end-users" in the diagram could be individual traders seeking to make a CDS trade, while the "large financial institutions" represent the major banks such as Dealer Defendants.



OTC Derivatives Counterparty Relationships

73.     In 2008, the Federal Reserve Bank of New York (the "Federal Reserve") hosted a series of meetings with CDS market participants, including Dealer Defendants and buy-side market

participants, to discuss establishing CCP clearing and other infrastructure improvements in the CDS market. The Federal Reserve was in favor of bringing CCP clearing to the CDS market because it would increase the amount and quality of market information available to market participants, regulators and the public. In addition, CCP clearing for CDS would reduce the systemic risk to the financial system associated with counterparty credit exposures.

74.    With pressure mounting, the major sell-side dealers, including Bank of America-Merrill Lynch, Barclays, BNP Paribas, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Royal Bank of Scotland and UBS, committed to central clearing of certain standard and liquid CDS products as documented in a July 31, 2008 letter to the Federal Reserve.

75.    Four clearinghouses presented proposals for CDS clearing at an October 2008 meeting of the Federal Reserve: Citadel/CME (CMDX, and later CME Clearing), IntercontinentalExchange/The Clearing Corporation (ICE Clear Credit), Eurex (Eurex Credit Clear) and NYSE Euronext. The Dealer Defendants viewed the CMDX, Eurex Credit Clear and NYSE Euronext clearing proposals as threats to maintaining OTC trading, and proceeded to undermine them in favor of ICE Clear Credit.

76.    Central clearing of CDS endangered the Dealer Defendants' control over the CDS market. The Dealer Defendants knew that if central clearing were available, exchange trading would become inevitable. While ICE Clear Credit allowed for clearing of OTC transactions, it did not, at the direction of the Dealer Defendants, support an exchange. Defendants, therefore, drove clearing volume to ICE Clear Credit, the clearing platform they controlled.

**Defendants Conspired to Prevent the CMDX Trading Platform from Launching**

77.    In 2008, Citadel and CME entered into a joint venture company, called CMDX, to launch the first fully integrated exchange trading platform and CCP clearing facility for CDS.

Exchange membership in CMDX was to be open to dealers, banks and institutional investors. Each exchange member could either be self-clearing or could clear through a clearinghouse participant. Clearinghouse membership was to be open to dealers and well-capitalized non-dealers (*e.g.*, buy-side firms). Citadel and CME expended millions of dollars to develop, build and test CMDX, such that exchange trading and central clearing through the CMDX venture was operationally ready as early as the fall of 2008. CMDX promised to substantially reduce buy-side transaction costs.

78.     In an October 17, 2008 press release, CME Group Executive Chairman Terry Duffy stated that the CMDX "joint venture is a best-of-both-worlds solution that will reduce much of the systematic risk inherent in the current CDS market structure." The press release further stated that the fully integrated trading and clearing solution would provide the following benefits to market participants:

   –    Enhanced liquidity through standardized contracts with fixed coupons for all the leading CDS indices and their underlying single-name components, with OTC market conventions, including credit event procedures;

   –    CME Group's well-established clearing, settlement and risk management capabilities with Citadel's state-of-the-art technology for price discovery, matching engine, and risk management analytics; [and]

   –    Facilities to convert existing bilateral trades to standardized contracts and straight through processing into CME Clearing, reducing bilateral credit risks, outstanding notional balances and capital requirements while providing more flexibility for trading in and out of existing positions . . . .

79.     Citadel and CME first presented CMDX to the marketplace at a July 2008 Federal Reserve meeting. The Dealer Defendants viewed exchange trading of CDS as a hostile threat to their control of the CDS market. With exchange trading, the Dealer Defendants would no longer be participants in every CDS transaction. The CMDX exchange platform would have allowed buyers to make anonymous public bids and sellers to make anonymous public offers, with a computer system matching bids and asks, thus side-stepping the necessity of involving the Dealer Defendants as

participants in every transaction.  Moreover, exchange trading matching anonymous buyers and sellers on the basis of publicly available information would make customers effective competitors to dealers and would drive volume.  As competition and volume increase and pricing becomes transparent, bid-ask spreads compress.  Furthermore, an exchange would have provided actual bid and ask quotes and trade data in real time.

80.     In efforts to launch the CMDX platform, Citadel and CME had a series of meetings and communications in 2008 with key players in the CDS market whose cooperation and licensing approval was essential for CMDX to succeed, including, most importantly, the Dealer Defendants, Markit and ISDA.  For example, the CMDX platform would need access to the intellectual property rights of the most frequently traded CDS indices – CDX and iTraxx – which were owned by Markit. CMDX would be at a significant disadvantage if it could not trade these indices given the popularity of index trading, and the CDX and iTraxx indices in particular.

81.     Markit and ISDA were engaged in licensing negotiations with CMDX throughout the summer and fall of 2008.  Defendants regularly engaged in communications that facilitated their conspiracy through their membership in Markit, ISDA, ICE Clear Credit and DTCC, given that the boards and committees of those institutions are dominated by the Dealer Defendants, and regularly hold private meetings.  The Dealer Defendants also engaged in direct communications with one another, apart from the communications in the course of serving on boards of the key institutions that they control.

82.     Markit stood to gain revenues from licensing its index CDS products and RED identifier system, so it was in Markit's unilateral economic self-interest to participate in launching CMDX.  CMDX planned to launch with all major CDX and iTraxx indexes, which Markit owned, as well as their single-name CDS components, covering more than 90% of the CDS market.  The

ability to offer exchange trading of the CDX and iTraxx indexes was important because index CDS constituted approximately 50% or so of the market. In addition, a functioning exchange would have necessarily created transaction data. Markit was the recipient and publisher of dealer mark data in the OTC market, and if an exchange had been set up, Markit was in a position to potentially sell the exchange's real-time transaction data.

83.    It was also in ISDA's unilateral economic self-interest to participate in launching CMDX because ISDA stood to gain increased licensing revenues for its industry standard contracts and protocols as a result of the increased volume of transactions and market participants that exchange trading would induce.

84.    Despite being in their economic self-interest to foster the creation of exchange trading in CDS, Markit and ISDA, acting in concert with and at the direction of the Dealer Defendants, denied CMDX the requisite licensing for the planned exchange. CMDX did eventually obtain licenses for the Markit indices on March 11, 2009, over five months after CMDX was ready to launch (pending regulatory approval). In the meantime, the Dealer Defendants cleared the necessary hurdles to launch their own clearinghouse, ICE Clear Credit, two days prior to granting CMDX the index licenses, thus securing a significant first-mover advantage. Moreover, the Dealer Defendants only instructed Markit and ISDA to license for OTC trading and not for exchange trading. By September 2009, it was reported that CME and Citadel had terminated the development of their originally planned electronic trading platform and exchange for CDS, instead focusing on a clearing-only service that was unable to clear its first buy-side trade until over nine months after the launch of the Dealer Defendant-controlled clearinghouse, ICE Clear Credit.

85.    Similarly, the Dealer Defendants, directing and working through ISDA, denied CMDX the requisite license to its standard contracts and protocols, including access to the ISDA

Master Agreement, which is the most-commonly used standard service agreement for OTC derivative transactions. By withholding these licensing agreements from CMDX, the Dealer Defendants quashed incipient competition and maintained their collective monopoly over OTC trading and the resulting supra-competitive transaction costs.

**Defendants Conspired to Ensure that ICE Clear Credit Became the Dominant Clearinghouse to the Exclusion Competing Clearinghouses**

86.     In conjunction with preventing CMDX from entering the market as an exchange platform in late 2008 and early 2009, the Dealer Defendants sought to ensure that CMDX's clearing platform (later renamed CME Clearing), as well as other clearinghouses, would fail to gain any foothold in clearing CDS. Although a clearing platform without an exchange would not eliminate the Dealer Defendants' position as the exclusive market makers in CDS, the Dealer Defendants did not want any entity to gain traction in clearing CDS because such traction could be used to expand into exchange trading which could decimate defendants' monopoly over the CDS market. Defendants, therefore, conspired to ensure that ICE Clear Credit – rather than CME Clearing or other competing clearinghouses – became the predominant clearinghouse because Dealer Defendants could control ICE Clear Credit and its business model.

87.     Fearing that CME Clearing's clearing approach, based off its futures infrastructure, would provide a ready foundation for exchange trading and independent clearing, the Dealer Defendants proceeded to undermine CME Clearing in several ways. For example, throughout at least the second half of 2008 and into 2009, they intentionally delayed licensing negotiations between CME Clearing, Markit and ISDA in order to delay CME Clearing's launch date. While the Dealer Defendants delayed the launch of CME Clearing, they rushed to launch their own clearinghouse – ICE Clear Credit (then named ICE Trust US). The Dealer Defendants control ICE Clear Credit, its membership and rules through seats on ICE Clear Credit's Risk Committee. A

December 2010 *New York Times* article reported that over half of the Dealer Defendants had executives on the Risk Committee, including Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan and UBS.

88.      ICE Clear Credit launched in March 2009 before CME Clearing or any other rival, thus securing a valuable first-mover advantage.  As a result of defendants' intentional delay in granting CME Clearing the requisite licensing, the vast majority of cleared CDS transactions were and are still cleared through ICE Clear Credit, which allows the Dealer Defendants to maintain their control of the CDS market and perpetuate OTC trading.  As a former dealer involved in the protracted negotiations between CME and Markit explained:

> CMDX was pretty much ready in October 2008 – all it needed was regulatory approval and the licences.  In the five months that CME waited, between the Fed meeting on October 10 and the licence being granted by Markit on March 11, the dealers and Ice were able to acquire TCC, build a CDS clearing house pretty much from scratch, secure the necessary regulatory approvals, get the licence permissions from Markit and just happen to be ready to launch on the following Monday.  The fact Markit then handed over the licence to CME two days after Ice Trust US was up and running I found to be telling.

89.      Chicago-based The Clearing Corporation ("TCC"), Atlanta-based Intercontinental Exchange (also known as "ICE") and Markit announced on October 10, 2008 – the same day as the meeting at the New York Federal Reserve – that they "had joined forces to support a joint global clearing solution for Credit Default Swaps."  This was followed by an October 30, 2008 announcement that ICE intended to acquire TCC as part of the formation of ICE Clear Credit.  At the time TCC was owned in part by Bank of America, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, UBS and Markit.

90.      Additionally, the Dealer Defendants exhausted CME Clearing of any independent influence it might exert by, for example, becoming members of CME Clearing so that they could control it and limit future membership.  In fact, Citadel, which the market understood had built the

exchange, was no longer a joint venture partner and remained merely a founding member of the newly restructured clearing-only entity.

91.     The Dealer Defendants also simultaneously funneled almost all of the CDS they cleared through ICE Clear Credit.  Together, this meant that CME Clearing had a minimal role in the CDS market, a minimal amount of price data, and little ability to promote the rise of alternative dealers, apart from the Dealer Defendants.

92.     Even once CME Clearing cleared the first buy-side CDS trade on December 15, 2009, the Dealer Defendants' founding members froze CME Clearing's ability to clear by imposing an extremely low "open interest cap" on the pretext that more work needed to be done to margin methodology.  The open interest cap imposed a limitation on the net notional amount per contract outstanding.  That work could have been done while CME Clearing still cleared contracts.  As of January 2013, CME Clearing had cleared CDS contracts with an aggregate open interest of only $49.5 billion, while the Dealer Defendant's ICE Clear Credit had cleared CDS contracts with an aggregate open interest of $737 billion, which, despite being its lowest point in 15 months, still equated to almost 15 times the open interest of CME Clearing.

93.     The Dealer Defendants' strategy was confirmed by an e-mail written by Sam Cole, Chief Operating Officer of BlueMountain Capital, a large buy-side participant in the CDS market and a firm that would have embraced exchange trading and clearing on the CMDX platform.  The e-mail followed a May 29, 2009 conference call of ISDA's credit steering committee and the buy-side clearing working group.  Mr. Cole stated, "***The dealers suggested more than once that there is room for only one solution in the market***. . . .  [T]he dealer community may be filibustering to protect its oligopoly and not seriously engaged in working with the buy side to develop a clearing solution."

94.     Eurex Credit Clear suffered a similar fate as CME Clearing, as the Dealer Defendants refused to clear the vast majority of their CDS transactions through any institution other than ICE Clear Credit.  Eurex Credit Clear is a CDS clearinghouse formed by Eurex Clearing – a subsidiary of Eurex, which is a joint venture of SIX Swiss Exchange ("SIX") and Deutsche Börse.  SIX operates Switzerland's principal stock exchange.  Deutsche Börse operates the Frankfurt Stock Exchange. Eurex is the largest futures and derivatives exchange in the world.  Eurex Clearing is one of the leading central counterparties globally.  Eurex Clearing is the CCP for all Eurex transactions, guaranteeing the fulfillment of all transactions in futures and options on futures traded on the Eurex exchange.

95.     On July 22, 2008, Eurex Clearing announced it was developing a CCP clearing solution for CDS called Eurex Credit Clear, subject to signing licensing agreements with Markit and ISDA.  The initial product scope focused on iTraxx index CDS products (owned by Markit) traded mainly out of Europe.

96.     Eurex Clearing presented the Eurex Credit Clear CDS clearing platform at the October 2008 Federal Reserve meeting. The proposal received support from European authorities, which also participated in the meeting.  Eurex Credit Clear was operationally ready in the first quarter of 2009 and obtained regulatory approvals by early August 2009.  Eurex Credit Clear offered clearinghouse membership to both sell-side and buy-side market participants.  On August 28, 2009, Eurex Clear Credit announced it cleared the first single-name CDS trade.  The transaction had a notional value of €5 million.

97.     Just like CME Clear, defendants were able to neutralize Eurex Credit Clear by driving clearing volume to ICE Clear Credit, which they controlled.  By January 6, 2010, Eurex Credit Clear had cleared only five trades worth $123 million.  In September 2010, Eurex Credit Clear decided to

stop actively looking for new CDS clearing business as it had failed to attract sufficient dealer support.

98.     Other clearinghouses also failed to gain CDS clearing business for the same reasons. NYSE Euronext's clearinghouse (Euronext Liffe), which was also presented at the October 2008 Federal Reserve meeting, shelved its CDS clearing business on July 29, 2009, after having failed to clear even a single CDS trade.  Similarly, LCH.Clearnet, another European-based clearinghouse, launched on March 31, 2010.  It failed to secure the cooperation of all but one of the Dealer Defendants prior to May 2012, at which point it announced the launch of CDS Clear, a service that would allow it to expand internationally.  Even so, LCH.Clearnet has failed to secure a U.S. CDS clearer despite opening offices in New York in mid-March 2009 to pursue opportunities.

99.     All other clearinghouses pale in comparison to defendant-controlled ICE Clear Credit and ICE Clear Europe's clearing activity.  As of June 10, 2013, ICE Clear Credit had cleared $24 trillion of CDS by gross notional value resulting in open interest of $823 billion.  Together, ICE's CDS clearinghouses have cleared a total of $41 trillion in gross notional value on a cumulative basis across 1.3 million trades with open interest of $1.5 billion.

**Defendants Excluded Alternative Dealers from Entering the Market Through Their Control of ICE Clear Credit**

100.    The Dealer Defendants controlled ICE Clear Credit and thus dominated the clearing of CDS.  The Dealer Defendants worked together to establish clearing rules which mandate that ICE Clear Credit, under the auspices of ICE Clear Credit's Risk Committee, accept trades only from clearing members.  At the launch of the ICE Clear Credit clearinghouse in March 2009, these clearing members included Bank of America, Barclays, BNP Paribas, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Merrill Lynch, Morgan Stanley and UBS, with HSBC, Royal

Bank of Scotland and BNP Paribas joining later in the year.  ICE Clear Credit has no buy-side clearing members.

101.    ICE Clear Credit's clearing members participate in a profit-sharing arrangement with ICE Clear Credit whereby they receive up to 35% of ICE Clear Credit's profits, which allows them to sustain a competitive advantage over other dealers that seek to be active in the CDS market but do not receive such preferential treatment.  Annual revenues on clearing services offered by the banks are estimated to be several billion dollars.

102.    The Dealer Defendants control ICE Clear Credit's membership and trading rules through seats on ICE Clear Credit's Risk Committee, which drafts and/or approves ICE Clear Credit's clearing rules.  The members of ICE Clear Credit's Risk Committee are not publicly disclosed, but were reported to include senior personnel of Dealer Defendants, including Ali Balali of Bank of America, Paul Mitrokostas of Barclays, Biswarup Chatterjee of Citi, Andy Hubbard of Credit Suisse, Athanassios Diplas of Deutsche Bank, Oliver Frankel of Goldman Sachs, Thomas J. Benison of JPMorgan, James Hill of Morgan Stanley and Paul Hamill of UBS.

103.    The Dealer Defendants utilized ICE Clear Credit's Risk Committee to restrict membership.  For example, in determining the amount of capital that a member must have to join the clearinghouse, ICE Clear Credit originally required clearing members to have $5 billion of net capital to join.  The Dealer Defendants enacted this requirement as a barrier to protect the Dealer Defendants' market share in the CDS market, and it had the effect of excluding alternative dealers and buy-side participation in the clearinghouse.  This membership barrier led one small brokerage vice president to conclude: "It appears that the membership criteria were set so that a certain group of market participants could meet that, and everyone else would have to jump through hoops."

104.   These actions even prevented major financial institutions such as BNY Mellon and State Street from meeting ICE Clear Credit's membership requirement.  In December 2010, *The New York Times* reported that BNY Mellon had been trying to become a clearing member since early in the year.  But its application to become a clearing member of ICE Clear Credit in 2010 was rejected on the grounds that "its derivatives operation ha[d] too little capital, and thus potentially pose[d] too much risk to the overall market."  Sanjay Kannambadi, chief executive of BNY Mellon Clearing, dismissed the explanation as absurd, stating "We are not a nobody.  But we don't qualify.  We certainly think that's kind of crazy."  Absent access to the clearinghouse, these institutions could not develop meaningful CDS dealing operations.

105.   ICE Clear Credit's capital requirement for membership is important because the Dealer Defendants have ensured that ICE Clear Credit will only clear transactions to which its members are a party.  The Dealer Defendants have refused to allow their customers to clear trades unless an ICE Clear Credit member is on the other side of the transaction.

106.   Under pressure to reform and in anticipation of action by the U.S. Commodity Futures Trading Commission ("CFTC"), in July 2011, ICE Clear Credit lowered its membership requirement from $5 billion to $100 million in net capital.  At the same time, however, ICE Clear Credit required that entities organized as broker-dealers or future commission merchants hold 5% of customer funds as excess net capital.

107.   As part of the CFTC's rulemaking process, the DOJ raised concerns that a clearinghouse's "captured committees could serve as a mechanism for attempts to restrict competition among dealers and other market participants."  Specifically, major dealers controlling a clearinghouse's operations "could result in their restricting access to new clearing members in an effort to insulate themselves from competition in making markets."  The DOJ further advised the

CFTC that "[t]hese actions against potential new clearing members could be explained away, for example, by expressing risk management-related concerns."

108.   In October 2011, the CFTC finalized a rule requiring only $50 million in capital for clearing membership.  The purpose of the CFTC's action was to reduce risk to the financial system resulting from concentration of CDS among the dealers that dominate the industry.  ICE Clear Credit, however, maintained the 5% capital rule, which still operates to exclude alternate dealers (such as broker-dealers and future commission merchants) from clearing CDS.

109.   But for defendants' collusion, plaintiff and other buy-side participants would have experienced significantly reduced transaction costs on single-name CDS and index CDS transactions, in line with the decreases seen in the markets for equity options, NASDAQ shares and corporate bonds.

### DEFENDANTS' ANTI-COMPETITIVE PRACTICES ATTRACT WORLDWIDE GOVERNMENTAL AND REGULATOR SCRUTINY

110.   Defendants' conduct in the CDS market has spurred investigations by the Antitrust Division of the DOJ and the European Commission.  Both investigations focus on defendants' efforts to prevent exchange-trading platforms from entering the CDS market.

111.   The DOJ's concerns over the lack of transparency in trading and pricing information in the derivatives markets are not new.  In fact, in its December 28, 2010 comment letter to the CFTC,[7] the DOJ discussed the numerous anti-competitive effects of allowing a small number of dealer banks to control execution and clearing platforms. In addition to warning of the potential that the dealers "might use such a platform to exclude rival dealers or other market participants that would otherwise compete for trading volume," the DOJ warned the CFTC that

---

[7]   *See* Comments of the U.S. Department of Justice, In the Matter of: RFN 3038-AD01 (Dec. 28, 2010), *available at* http://www.justice.gov/atr/public/comments/265618.htm.

> A dealer-controlled trading platform also might release less innovative data products or be less transparent than would an independent platform.  Further, major dealers might use their control of a dominant trading platform to disadvantage rivals by . . . continu[ing] trading over the counter even in instances where exchange trading is feasible.

Such a trading platform, the DOJ concluded, "would be roughly analogous to the three or five largest airlines controlling all landing rights at every U.S. airport – the big carriers could use this control to disadvantage smaller carriers by restricting landing rights or raising their rivals' costs to access the airports."

112.    Both the DOJ and European Commission have suggested that participants in the CDS market are paying higher prices for CDS than they would otherwise pay in a more competitive market.  For example, the European Commission stated that "the banks acted collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market."[8]  Similarly, it has been reported that the DOJ's investigation centers on "whether the big financial institutions had worked to keep transactions in these insurance-like instruments [(CDS)] closed to competitors and more profitable for themselves."[9]

**The Department of Justice Investigates Defendants'**
**Anti-competitive Practices in the CDS Market**

113.    In July 2009, the DOJ opened an investigation into the possibility of anti-competitive practices in the CDS market.   According to Alisa Finelli, a spokeswoman for the DOJ, the government probe is focused on "the possibility of anticompetitive practices in the credit derivatives

---

[8]      Press Release, European Commission, *Antitrust: Commission sends statement of objections to 13 investment banks, ISDA and Markit in credit default swaps investigation*, July 1, 2013, *available at* http://europa.eu/rapid/press-release_IP-13-630_en.htm.

[9]      Gretchen Morgenson, *Trying to Pierce a Wall Street Fog*, N.Y. Times, July 20, 2013, *available at* http://www.nytimes.com/2013/07/21/business/trying-to-pierce-a-wall-street-fog.html.

clearing, trading and information services industries." On July 13, 2009, Markit publicly confirmed that the DOJ was investigating the CDS market, and that it had "been informed of an investigation by the Department of Justice into the credit-derivatives and related markets."

114.   Two days later, on July 15, 2009, the DOJ confirmed that its antitrust division was investigating "anticompetitive practices in the credit derivatives clearing, trading and information services industries." According to various media reports, the investigators centered, in part, on whether the Dealer Defendants, the major banks that own Markit, got special access to information or data, giving them an unfair advantage in the multitrillion-dollar CDS market. Markit itself has acknowledged that its "privileged relationships with 16 shareholder banks" gives it "unparalleled access to a valuable dataset spanning credit, equities and the broader OTC derivative universe."

115.   On July 21, 2009, the DTCC, which provides clearing, settlement, and information services for equities, corporate and municipal bonds, government and mortgage-backed securities, money market instruments and OTC derivatives, confirmed that it had received a subpoena from the DOJ as part of the government's investigation into the CDS market. Citi, Deutsche Bank, Goldman Sachs, JPMorgan and Morgan Stanley have disclosed that they are under investigation for anti-competitive conduct in the CDS market.

116.   The DOJ served Civil Investigative Demands ("CIDs") on Markit and other defendants and has deposed executives on both the sell-side and buy-side. The DOJ has not disclosed upon which companies it served CIDs.

117.   In May 2012, the DOJ expanded its investigation to include Markit's RED identifier system. The RED identifier system allows trades in the CDS market to be confirmed and tracked by verifying reference entity and reference obligation data. The DOJ also expanded its investigation to include sell-side banks' participation in and profit-sharing agreement with ICE Clear Credit, a CDS

clearinghouse controlled and dominated by the Dealer Defendants. The DOJ's investigation is active and ongoing.

**The European Commission Commences Probe of**
**Defendants' Manipulative and Anti-competitive CDS Practices**

118. On April 29, 2011, the European Commission unveiled two antitrust investigations into the CDS market, targeting the Dealer Defendants and other financial institutions and clearinghouses that operate in the market for CDS. The paired European Commission probes examine whether a lack of transparency in the CDS market has led to abusive behavior by banks and violations of European competition rules and whether defendants colluded to ensure the CDS remained an OTC product, thereby preserving the banks' lucrative role as middlemen. In short, the investigation centers on whether, from 2006 to 2009, the banks protected their indispensable position in the more than $25 trillion global market through "control" of a trade body and information provider, which vetted whether new exchanges should be licensed.

119. The European Commission's first investigation examined whether the Dealer Defendants colluded with Markit in order to control access the transactional data and other financial information available on CDS market. The European Commission indicated that these 16 dealer banks give most of their pricing, indices and other essential daily data exclusively to Markit. These exclusivity agreements, which amount to either an anti-competitive plot or an abuse of collective domination, have the effect of foreclosing access to valuable raw data by other information service providers.

120. The second investigation is examining whether clauses in Markit's licensing and distribution agreements were abusive and impeded competition in the market for the provision of CDS information. In its second investigation, the European Commission is investigating agreements among nine Dealer Defendants (Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank,

Goldman Sachs, JPMorgan, Morgan Stanley and UBS) and ICE Clear Europe, a CDS clearing platform organized by ICE and promoted by the dealers. These agreements, which contain a number of clauses, such as preferential fee and profit-sharing arrangements, create an incentive for the banks to use only ICE's clearinghouses, thereby preventing other competitive clearinghouses from entering the market and creating a situation where other CDS market participants have few options for where to clear their transactions. The European Commission's probe is also investigating whether ICE Clear Europe's fee structures discriminate against other CDS dealers to the unfair advantage of the nine banks.

121.    On March 26, 2013, the European Commission expanded its antitrust investigation into the CDS market and defendants' manipulative and anti-competitive practices to include ISDA, a professional organization of financial institutions involved in the OTC trading of derivatives. The European Commission found evidence that ISDA was "involved in a coordinated effort of investment banks to delay or prevent exchanges from entering the credit derivatives business," explaining that such behavior "would stifle competition in the internal market in breach of EU antitrust rules." The European Commission confirmed that it was continuing to examine whether CDS dealers used Markit to foreclose entry by certain CDS trading platforms.

122.    On July 1, 2013, the European Commission issued a Statement of Objections addressed to Bank of America-Merrill Lynch, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan-Bear Stearns, Morgan Stanley, Royal Bank of Scotland, UBS, ISDA and Markit. The Statement of Objections informed these banks and entities that the European Commission reached a "preliminary conclusion that they infringed EU antitrust rules that prohibit anti-competitive agreements by colluding to prevent exchanges from entering the credit derivatives business." Commission Vice President in charge of competition policy, Joaquín

- 44 -

Almunia, indicated that the banks collectively blocked exchanges to protect their revenues from OTC trading of credit derivatives.  Based on its investigation, including the review of defendants' documents and testimony, the European Commission found:

> Deutsche Börse and the Chicago Mercantile Exchange tried to enter the credit derivatives business.  The exchanges turned to ISDA and Markit to obtain necessary licenses for data and index benchmarks, but, according to the preliminary findings of the [European] Commission, *the banks controlling these bodies instructed them to license only for "over-the-counter" (OTC) trading purposes and not for exchange trading*.  Several of the investment banks also sought to shut out exchanges in other ways, for example by coordinating the choice of their preferred clearing house.
>
> The [European] Commission takes the preliminary view that *the banks acted collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market*.

123.    According to the European Commission, the Dealer Defendants used other tactics to shut out competition from exchanges, including coordinating their choices of preferred clearinghouses for CDS transactions.

124.    The European Commission's Statement of Objections confirms the allegations made in this Complaint that defendants unlawfully conspired to prevent exchange trading of CDS to the detriment of plaintiff and the Class.

## FRAUDULENT CONCEALMENT

125.    By its very nature, the unlawful activity alleged herein was self-concealing. Defendants conspired and engaged in secret and surreptitious activities in order to control and manipulate the CDS market and impose supra-competitive bid-ask spreads.

126.    Defendants fraudulently concealed their anti-competitive activities by, among other things, engaging in secret communications in furtherance of the conspiracy.

127.    Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of the agreements alleged herein.

128.    None of the facts or information available to plaintiff, if investigated with reasonable diligence, could or would have led to the discovery of the conduct alleged in this Complaint. Plaintiffs and the Class were led to believe that the CDS prices offered to them were the product of legitimate market conditions rather than defendants' manipulative collusive activities.

129.    As a result, plaintiff was prevented from learning of the facts needed to commence suit against defendants until no earlier than July 15, 2009 when the DOJ publicly acknowledged its investigation of Markit.    Even after July 15, 2009, defendants continued to conceal their anti-competitive conduct in the CDS market, and no other public source of information could or would have led to the discovery of the conduct alleged in this Complaint until further facts about the European Commission's investigation were disclosed in April 2011.

130.    There are many reasons why these facts could not have been known:  (1) Dealer Defendants' trades and trading strategies are not public information; (2) clearinghouses do not publish information concerning particular trading entities, including trading between dealer entities; and (3) the bilateral, non-exchange traded nature of the trades at issue further obscures what defendants were, and are, doing at any particular time.

131.    Because of defendants' active steps, including fraudulent concealment of their conspiracy to prevent plaintiff from suing them for the anti-competitive activities alleged in this Complaint, defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLASS ACTION ALLEGATIONS

132.   Plaintiff brings this action as a class action under Rule 23(a) and 23(b)(3) of the

Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated. The "Class" is

defined as:

> All "buy side" persons or entities that paid a bid-ask spread on single-name CDS transactions or CDX or iTraxx index CDS transactions in the United States directly to "sell side" Dealer Defendants (or their subsidiaries and/or affiliates), between January 1, 2008 and the present. Excluded from the Class are defendants and their employees, affiliates, parents, subsidiaries and co-conspirators, whether or not named in this Complaint, the United States government, and the Court and any members of the Court's immediate family.

133.   The Class is so numerous that joinder of all members is impracticable. While the

exact number of Class members is unknown to plaintiff at this time, plaintiff is informed and

believes that at least thousands of geographically dispersed Class members purchased CDS during

the relevant period consistent with the Class definition.

134.   Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff

and the members of the Class sustained damages arising out of defendants' common course of

conduct in violation of the antitrust laws as alleged herein.

135.   Plaintiff will fairly and adequately protect the interests of the members of the Class

and has retained counsel competent and experienced in class action litigation, including antitrust

class action litigation.

136.   Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class. Among the

questions of law and fact common to the Class are:

(a)   whether defendants conspired to maintain supra-competitive bid-ask spreads

on buy-side CDS transactions;

(b)     whether defendants conspired to maintain and perpetuate the OTC trading regime by which they controlled the CDS market;

(c)     whether defendants conspired to obtain and maintain their sell-side monopoly in the CDS market;

(d)     whether defendants agreed to block market entrants such as CMDX from the CDS market and prevent the introduction of exchange trading in CDS;

(e)     the appropriate measure of damages for the injury sustained by plaintiff and other members of the Class as a result of defendants' unlawful activities;

(f)     whether defendants unjustly enriched themselves at the expense of the Class; and

(g)     whether defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or declaratory relief with respect to the Class as a whole.

137.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.   The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and the parties, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.   A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

138.    The interest of members of the Class in individually controlling the prosecution of separate actions is highly limited and impractical.   The Class has a high degree of cohesion and

prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are often not great enough individually to enable them to maintain separate suits against defendants relative to the costs and expenses of maintaining such separate suits. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## COUNT I

### Sherman Act §1: Conspiracy to Fix and Maintain CDS Bid-Ask Spreads Against the Dealer Defendants

139. Plaintiff incorporates by reference the allegations set forth above in ¶¶1-138.

140. Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §1.

141. The conspiracy consisted of a continuing agreement, understanding, or concerted action to maintain and/or inflate bid-ask spread on CDS transactions. The combination and conspiracy to restrain trade in the CDS market has been effectuated by the means set forth above, among others. Specifically, the contract, combination or conspiracy consisted of an agreement among defendants to, *inter alia*: (1) preclude potential competitors from creating a competitive CDS exchange in the United States; (2) establish rules, policies and understandings through ISDA, Markit and DTCC that would assist in precluding such competition; (3) deny potential competitors access to valuable information and data, including real-time CDS bid and ask prices, needed to create a competitive CDS exchange in the United States; (4) collectively block or restrict access to the establishment of competing CDS clearinghouses in order to steer CDS trading to the Dealer Defendants; and (5) establish ICE Clear Credit as a proxy to preclude the creation of a competitive CDS exchange in the United States.

142.     In carrying out their conspiracy to fix, maintain and/or inflate bid-ask spread on CDS transactions, defendants participated in meetings, conversations and communications to further their anti-competitive practices, including by and through the Dealer Defendants' participation in and control of ISDA, Markit and DTCC, and agreed during those meetings, conversations and communications to take actions intended to further the conspiracy.

143.     The conspiracy is a per se violation of §1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anti-competitive effects in the CDS market, as set forth above. There is no legitimate business justification for, or pro-competitive benefits caused by, defendants' conduct.

144.     The conspiracy caused injuries to competition in the CDS market, including, among others: bid-ask spreads on CDS transactions between Dealer Defendants and plaintiff and the Class were fixed at supra-competitive levels; plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the CDS market; plaintiff and the Class have been deprived of the benefits of innovation and openness that would have flowed from exchange trading; and competition in the CDS market has been unlawfully restrained and eliminated.

145.     As a proximate result of defendants' violation of §1 of the Sherman Act, plaintiff and the Class have suffered injury to their business and property.  Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT II

### Sherman Act §2: Conspiracy to Monopolize the
### CDS Market Against All Defendants

146.     Plaintiff incorporates by reference the allegations set forth above in ¶¶1-145.

147.     Defendants entered into and engaged in a contract, combination or conspiracy to monopolize in violation of §2 of the Sherman Act, 15 U.S.C. §2.

148.   Defendants conspired with the specific intent, knowledge and purpose that their anti-competitive agreement would result in excluding competition from the CDS market to artificially inflate bid-ask spreads on CDS transactions.

149.   Defendants have committed overt acts in furtherance of their conspiracy, as detailed above.

150.   The conspiracy proximately caused substantial anti-competitive effects in the CDS market.  There is no legitimate business justification for, or pro-competitive benefits caused by, defendants' unreasonable restraint of trade.  Any ostensible pro-competitive benefit was pretextual or could have been achieved by less restrictive means.

151.   The conspiracy caused injuries to competition in the CDS market, including, among others: bid-ask spreads on CDS transactions between the Dealer Defendants and plaintiff and the Class were fixed at supra-competitive levels; plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the CDS market; plaintiffs and the Class have been deprived of the benefits of innovation and openness that would have flowed from exchange trading; and competition in the CDS market has been unlawfully restrained and eliminated.

152.   Plaintiff and the Class have been injured in their business and property by reason of defendants' violation of §2 of the Sherman Act, 15 U.S.C. §2, within the meaning of §4 of the Clayton Act, 15 U.S.C. §15.

153.   The injury to plaintiff and the Class is of the type the antitrust laws were designed to prevent and flows from that which makes defendants' acts unlawful.

154.   As a proximate result of defendants' violation of §2, plaintiff and the Class have suffered injury to their business and property.  Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT III

### Sherman Act §2:  Monopoly Maintenance Against Defendant Markit

155.     Plaintiff incorporates by reference the allegations set forth above in ¶¶1-154.

156.     Defendant Markit possesses monopoly power over the market for trading CDS.  By virtue of Markit's monopoly, Markit transactional data and index licenses are necessary and required to fully participate as a dealer or exchange in the CDS market.

157.     By taking the actions described herein, Markit has attempted to, and has, maintained and expanded its monopoly.  These acts violate §2 of the Sherman Act, 15 U.S.C. §2.

158.     Plaintiffs and the Class have been damaged by Markit's anti-competitive actions and, if Markit is not enjoined from further anti-competitive actions, will continue to suffer injury to their business and property.

## COUNT IV

### Sherman Act §2:  Refusal to Deal Against Defendant Markit

159.     Plaintiff incorporates by reference the allegations set forth above in ¶¶1-158.

160.     Defendant Markit has unlawfully exercised its monopoly power in the CDS market by refusing to deal with would be or prospective dealers and exchanges without legitimate business justification in violation of §2 of the Sherman Act, 15 U.S.C. §2.

161.     As set forth herein, Markit has monopoly power over the CDS market, as demonstrated by its control over transactional data, index licenses and relationships with co-conspirators Dealer Defendants, and also by specific conduct that demonstrates its power to exclude competition in the CDS market and control access to transactional information and other information necessary to participate in the CDS market as a dealer or exchange.

162.     As a monopolist in the CDS market, Markit has engaged in exclusionary conduct by refusing to deal with various competitors, including CME and Citadel.  Markit controlled access to

and dissemination of CDS transactional data, as well as data and index licenses, and refused to provide licenses for data and index benchmarks necessary to develop a central clearinghouse and exchange for the trading of credit derivatives to would-be market participants such as Citadel, CME and Deutsche Börse for the purpose of maintaining its monopoly power.

163.   Markit lacks any legitimate business justification for its refusal to deal with would-be market participants, including prospective brokers and clearinghouses; rather, the sole purpose of Markit's refusal is to stifle competition and maintain its monopoly power.  Markit's conduct in refusing to deal with would-be CDS market dealers and clearinghouses and prevent the development of an exchange for trading CDS harms the competitive process by denying market participants access to these services.

164.   Markit's anti-competitive intent is further demonstrated by tying access to transactional data and index licenses to the DSAs with the Dealer Defendants and the Dealer Defendants' ownership of an equity interest in Markit.

165.   Markit's refusal to deal has the effect of (i) preventing the development of a formal exchange for the trading of CDS; (ii) preventing the widespread dissemination of public pricing information; (iii) restricting customers from freely accessing the CDS market with dealers and clearing entities of their choosing; and (iv) requiring that any and all CDS transactions include a deal counterpart.  If CDS market participants had access to widespread CDS transactional information and could freely choose with whom to conduct its CDS transactions, Markit's monopoly power would deteriorate and it would no longer control access to and the dissemination of CDS transactional data and the CDS market generally.   Markit's refusal to deal thus has the anti-competitive consequences Markit intends.

166.    Plaintiff and the Class have been damaged by Markit's anti-competitive actions and, if Markit is not enjoined from further anti-competitive actions, will continue to suffer injury to its business and property.

## COUNT V

### Unjust Enrichment Against All Defendants

167.    Plaintiff incorporates by reference the allegations set forth above in ¶¶1-166.

168.    Defendants financially benefited from their extensive unlawful acts described herein, including, but not limited to, fixing, raising, manipulating and/or artificially inflating bid-ask spreads on CDS transactions, withholding or otherwise preventing the widespread dissemination of public pricing information of CDS, and conspiring and coordinating to jointly prevent exchanges from entering the CDS market between 2006 and 2009.  These unlawful acts caused plaintiff and other members of the Class to suffer injury, lose money and transact in the CDS market at artificial prices.

169.    As a result of the foregoing, it would be inequitable and unjust for defendants to be permitted to enrich themselves in this manner.

170.    Each defendant, in equity and good conscience, should be required to pay restitution or its own unjust enrichment to plaintiff and members of the Class.

171.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to defendants from their unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands relief as follows:

A.      That the unlawful conduct alleged herein be adjudged and decreed to be in violation of §§1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2;

B.      That defendants, their subsidiaries, affiliates, successors, transferees, and assignees, and their respective officers, directors, partners, agents and employees, and all other persons acting

- 54 -

or claiming to act on their behalf, under §16 of the Clayton Act, 15 U.S.C. §26, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in this Complaint;

C. That the Court certify the Class alleged herein under Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure;

D. That the Court award damages sustained by plaintiff and the Class, under §4 of the Clayton Act, 15 U.S.C. §15, in an amount to be proved at trial, to be trebled according to law, plus interest, including prejudgment interest, attorneys' fees and costs of suit;

E. That the Court grant plaintiff and the Class appropriate declaratory and injunctive relief under §16 of the Clayton Act, 15 U.S.C. §26; and

F. That the Court directs such further relief it may deem just and proper.

<strong>JURY DEMAND</strong>

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury trial as to all issues triable by a jury.

DATED: November 7, 2013    ROBBINS GELLER RUDMAN
                 & DOWD LLP
               SAMUEL H. RUDMAN

                SAMUEL H. RUDMAN

              58 South Service Road, Suite 200
              Melville, NY  11747
              Telephone:  631/367-7100
              631/367-1173 (fax)
              srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
PATRICK J. COUGHLIN
DAVID W. MITCHELL
BRIAN O. O'MARA
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
patc@rgrdlaw.com
davidm@rgrdlaw.com
bomara@rgrdlaw.com

Attorneys for Plaintiff

C:\Users\dgonzales\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\14MXMFT7\CDS Antitrust_SDNY.docx

or claiming to act on their behalf, under §16 of the Clayton Act, 15 U.S.C. §26, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in this Complaint;

C.      That the Court certify the Class alleged herein under Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure;

D.      That the Court award damages sustained by plaintiff and the Class, under §4 of the Clayton Act, 15 U.S.C. §15, in an amount to be proved at trial, to be trebled according to law, plus interest, including prejudgment interest, attorneys' fees and costs of suit;

E.      That the Court grant plaintiff and the Class appropriate declaratory and injunctive relief under §16 of the Clayton Act, 15 U.S.C. §26; and

F.      That the Court directs such further relief it may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury trial as to all issues triable by a jury.

DATED:  November 8, 2013                ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                        SAMUEL H. RUDMAN


                                        SAMUEL H. RUDMAN

                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)
                                        srudman@rgrdlaw.com

- 55 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
PATRICK J. COUGHLIN
DAVID W. MITCHELL
BRIAN O. O'MARA
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
patc@rgrdlaw.com
davidm@rgrdlaw.com
bomara@rgrdlaw.com

Attorneys for Plaintiff